UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

David Clauson,

        Plaintiff,

   vs.                        REPORT  AND  RECOMMENDA-
TION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

        Defendant.        Civ. No. 04-3312 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision, which denied his application for Disability Insurance Benefits ("DIB").

The matter is now before the Court upon the parties' cross-Motions for Summary

Judgment.  For these purposes, the Plaintiff has appeared by Lionel H. Peabody, Esq.,

and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II.  Procedural History

The Plaintiff filed an application for DIB on July 19, 2002, in which he alleged that he had become disabled on January 31, 2002.  [T. 54-56, 72].  His claims were denied upon initial review, and upon reconsideration.  [T. 32-36, 39-41].

On March 3, 2003, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on August 6, 2003, a Hearing was conducted, at which the Plaintiff appeared personally, and by legal counsel.  [T. 213-271].  Thereafter, on December 13, 2003, the ALJ issued a decision which denied his claim for benefits.  [T. 13-23].  The Plaintiff requested an Administrative Review before the Appeals Council which, on June 17, 2004, declined to review the matter further.  [T. 7-10].  Thus, the ALJ's determination became the final decision of the Commissioner.  Grissom v. Barnhart, --- F.3d ---, 2005 WL 1844476 (8th Cir., August 5, 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.  This action was commenced on July 16, 2004.

## III.  Administrative Record

- 2 -

A.    Factual Background.  At the time of the ALJ's decision, the Plaintiff was sixty-one (61) years old, and he was a college graduate.  [T. 54, 110-12].  The Plaintiff had prior work experience as an insurance sales agent and, after his alleged onset date, he obtained his real estate license, and worked briefly in that field, as a salesman.  [T. 109, 222-24].  As related by the Plaintiff, he stopped working on January 31, 2002, because he "decided to take time off and have now decided [he is] not going to go back."  [T. 72].  The Plaintiff alleges that he cannot work due to his condition of atrial fibrillation which, he explained, causes a shortness of breath, decreased energy, and a decreased ability to concentrate.  Id.

On August 24, 2001, the Plaintiff reported to the Urgent Care unit, at St. Luke's Medical Clinic, complaining of a headache, which had lasted one week.  [T. 177-179].  The Plaintiff explained that the headache started in the back of his neck, and wrapped around the anterior of his head to his forehead, which was making it difficult to work.  [T. 177].  At its worst, the Plaintiff characterized the severity of his headache at a level five (5) out of ten (10) but, at the time of the visit, it had improved to a level one (1).  Id.  The Plaintiff did not report any changes in his vision or hearing, no paresthesias in the extremities, no palpitations or chest pain, no difficulty with mentation or speech, and no photophobia, or nausea.  Id.  The Plaintiff reported having a lot of stress, and

- 3 -

he was planning to leave his job, but had conflicted feelings about doing so.  Id.  In addition, the physician noted that the Plaintiff had "a past medical history significant for atrial fibrillation which he diagnosed himself" and, although the condition had made him "slightly more fatigued," it had "not significantly limited his activities."  Id.  The Plaintiff refused Coumadin,[1] and was prescribed Flexeril,[2] instead, after he was diagnosed with a tension headache.  [T. 177-78].

One week later, the Plaintiff called Urgent Care, concerning a recurrence of his headache.  [T. 175-76].  The Plaintiff reported that the Flexeril had resolved his headache, and he was feeling so much better that he went on an eighteen (18) mile bike ride.  [T. 175].  Although he stated that the headache had improved, he requested a refill of the Flexeril, which the physician gave him.  Id.  The physician noted that the Plaintiff did not report experiencing any racing of the heart, or palpitations.  Id.  In filling out an "Adult Patient History Form" on September 7, 2001, the Plaintiff reported

---

[1]Coumadin "is indicated for the prophylaxis and/or treatment of the thromboembolic complications associated with atrial fibrillation and/or cardiac valve replacement."  Physicians' Desk Reference, p. 1040 (59th Ed. 2005).

[2]Flexeril "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions."  Physicians' Desk Reference, at 1931 (59th Ed. 2005).

that he exercised frequently, by cycling, walking, and performing chores at home.  [T. 170].

On September 28, 2001, the Plaintiff saw Dr. Steven Long, for the first time, and he reported a self-diagnosed history of atrial fibrillation, but that he had "never had his atrial fibrillation worked up."   [T. 165].   Dr. Long ordered a colonoscopy, an echocardiogram, and a "PSA," and the Plaintiff was instructed to return in a few weeks for a complete physical exam.  Id.  The Plaintiff returned on October 24, 2001, for the physical, at which time, he reported that he did not have any particular concerns, and that he walked regularly, and bicycled for exercise.  Id.  Although the Plaintiff reported a history of intermittent atrial fibrillation, and hypertension, Dr. Long noted that his heart had a regular rate and rhythm.   [T. 164-65].   In addition, the PSA and the echocardiogram were normal.  [T. 144, 164].  Dr. Long diagnosed the Plaintiff with hypertension, which had not been controlled with fifty (50) milligrams of Atenolol,[3] so that would be increased to seventy-five (75) milligrams, and intermittent atrial fibrillation.  Id.  The Plaintiff was "absolutely not interested in Coumadin," and Dr.

---

[3]Atenolol is the "used in the treatment of hypertension and chronic angina pectoris."  Dorland's Illustrated Medical Dictionary, p. 166 (29th Ed. 2000).

- 5 -

Long explained that, if Atenolol did not "keep[] him in check," a change to Cardizem,[4] or Amiodarone,[5] would be appropriate.  Id.  Finally, Dr. Long instructed the Plaintiff to continue taking one aspirin per day.  Id.

The Plaintiff had a reevaluation of his hypertension, on December 6, 2001, at which time, he reported that his home blood pressure checks were consistently showing borderline hypertension, and that he was "going in and out of atrial fibrillation."  [T. 163].  Dr. Long repeated his earlier diagnosis of uncontrolled hypertension, and started the Plaintiff on a course of Cardizem, in addition to the Atenolol, with the intention of weaning him off of Atenolol, and having him take only Cardizem, in order to control his blood pressure, which would also help control his atrial fibrillation.  Id.

In June of 2002, the Plaintiff complained of left eye dryness, which reportedly had happened numerous times throughout his life.  [T. 161].  On July 15, 2002, the Plaintiff reported that he would be applying for DIB.  Id.  Approximately one week

---

[4]Cardizem "is indicated for the treatment of hypertension."  Physicians' Desk Reference, at 969 (59th Ed. 2005).

[5]Amiodarone is "a potassium channel blocker that prolongs the action potential duration and refractory period of all cardiac fibers."  Dorland's Illustrated Medical Dictionary, p. 166 (29th Ed. 2000).

later, the Plaintiff came in to discuss atrial fibrillation, because he was "quite certain that he ha[d] been in it in the past many times, but ha[d] a phobia of seeing physicians, and so ha[d] never sought care for [it]." [T. 160]. Dr. Long noted that he had spoken to the Plaintiff about Coumadin, but that he was uninterested, and also noted that a "TSH" had been conducted, which was normal. Id. Dr. Long diagnosed him with intermittent arrhythmia, which was possibly atrial fibrillation, and noted that the Plaintiff would be set up with an event monitor, in order to document it. [T. 159]. The Plaintiff was also referred to Dr. Taylor for further evaluation. Id.

On July 24, 2002, the Plaintiff reported that he was in "fib," and wanted to have an electrocardiogram done, which "showed a fib with good rate control." [T. 132, 142, 159]. When the Plaintiff visited Dr. Taylor on August 23, 2002, he reported that he had a lack of energy during the periods of atrial fibrillation and, although he was still able to do things, he had no enjoyment in those activities, and he experienced shortness of breath. [T. 130]. Additionally, the Plaintiff reported being quite active, and stated that he rode his bicycle up to sixty (60) or seventy (70) miles at a time, without any angina, or dyspnea, except when he was in atrial fibrillation. [T. 130]. On August 27, 2002, Dr. Yu-chen Lee reviewed the Plaintiff's records, and noted that the Plaintiff reported atrial fibrillation, which occurred a couple of times per week, but which would

spontaneously return to sinus rhythm and, during those episodes, the Plaintiff complained of frequent urination.  [T. 113].  However, Dr. Lee observed that there was "no evidence to substantiate this claim in the file" and, although the Plaintiff had mild high blood pressure, it could be controlled by more aggressive drug treatment, and it was a non-severe impairment.  [T. 114-15].  In September, and December of 2002, two different State Agency physicians each concluded that the Plaintiff could perform light exertional work, with no additional limitations.  [T. 116-123, 148-153].

On September 24, 2002, the event monitor was "[r]elatively unremarkable."  [T. 141].  In October of 2002, the Plaintiff reported being in atrial fibrillation about half of the time, and he reported difficulties concentrating, but he remained busy with home remodeling projects, and he was still reluctant to consider treatment options.  [T. 125-26].  When a stress echocardiogram was conducted, in that same month, the overall function of the heart was found to be functioning at the lower limits of normal, the response exercise was normal, and there was no evidence of decreased blood supply to the heart.  [T. 124, 134-38].  By December 10, 2002, the Plaintiff was noted to have a long list of recent blood pressures, which were "quit[e] good," and atrial fibrillation, with a controlled rate.  [T. 158].

In June of 2003, the Plaintiff reported low back pain, which had been occurring for months, but had been exacerbated, within the past few weeks. [T. 182]. At that time, the Plaintiff reported that he "ha[d] no trouble sleeping." Id. X-rays revealed only minimal degenerative changes, and he was diagnosed with a probable lumbar strain. [T. 181-82].

Finally, in September of 2003,[6] the Plaintiff reported to the emergency room, with complaints of chest pressure. [T. 195]. An evaluation revealed ST elevation, and elevated enzymes, and the Plaintiff was admitted for monitoring, and further cardiac evaluation. Id. The Plaintiff's heart rate and rhythm were noted to be regular. [T. 196]. Dr. Long requested a consultation by Dr. Stephen Bernard, who found that he had a history of atrial fibrillation, that was being treated with rate control, which the Plaintiff had tolerated well, and hypertension, which had also been well-treated. [T. 192]. Dr. Bernard recommended that the Patient be taken for cardiac catheterization, prior to his discharge. [T. 193]. The results of that examination revealed that the Plaintiff had an "[o]ccluded small distal branch off the posterolateral branch of the

---

[6]Although these medical records were generated subsequent to the Hearing before the ALJ, it appears as though the ALJ considered them in rendering his decision. [T. 19].

right coronary artery[;] [m]ild scattered disease in the left anterior descending primarily involving its mid segment with mildly reduced TIMI grade flow in the left anterior descending proper graded at TIMI II for its flow[;] [m]ild disease involving the obtuse marginal and circumflex vessel as described above[;]" and "[l]eft ventricular function at the lower limits of normal to mildly impaired with hypokinesia of the posterior basal wall." [T. 187]. When the Plaintiff saw Dr. Taylor, he reported that his atrial fibrillation had become permanent three months earlier, but he remained active, working for four hours a day at Menards, and he was able to keep up with people in their 20s, although he experienced some fatigue, and decreased stamina. [T. 183]. Further, Dr. Taylor opined that the risk/benefit ratio favored the use of Coumadin, but the Plaintiff was reluctant to do so, and was similarly reluctant to try radiofrequency ablation, or a surgical procedure. [T. 185]. The Plaintiff reported that he had been feeling reasonably well, with a rate control strategy, for the previous three months. Id.

B.  Hearing Testimony. The Hearing on August 6, 2003, commenced with some opening remarks from the ALJ. [T. 215-16]. The Plaintiff's attorney related that he would be submitting additional records -- namely, the pay stubs from the Plaintiff's then-current part-time position. [T. 216]. The attorney also objected to any consideration of the Plaintiff's prior position, as a real estate salesman, as past relevant

- 10 -

work, because he had not made any money.  [T. 218].  After the Plaintiff's attorney

delivered an opening statement, the ALJ began questioning the Plaintiff.  [T. 218-20].

The Plaintiff testified that he was right-handed, he was six feet tall, and he

weighed approximately 195 pounds, which had remained fairly stable over the past

three years.  [T. 220].  The Plaintiff became widowed in 1990, and he had lived alone,

since the time that his son moved out.  [T. 220-21].  At the time of the Hearing, the

Plaintiff worked twenty (20) hours per week at Menards, for which he earned $7.45 per

hour, plus additional pay for working on the holidays.  [T. 221].  In that position, the

Plaintiff spent approximately ninety-five (95) per cent of his time stocking hardware,

and the rest of the time, he was assigned to the plumbing, or electrical departments.

[T. 222].  In March of 2002, the Plaintiff began to work in real estate sales, for which

he obtained a license, in January, or February, of that year.  [T. 222-23].  The Plaintiff

testified that he had an advantage, because he was able to take a mailing list of between

500 and 600 people, which he obtained from his insurance agency.  [T. 223].

Approximately two months after beginning that job, the Plaintiff awoke with his heart

"kicking into the atrial fib," and he called the secretary to inform her that he was

quitting.  Id.  Ten minutes later, the broker from his office called, and talked the

Plaintiff into returning, which he did, and after which he was able to make a couple of sales. [T. 224]. However, the Plaintiff testified that "it was just too hard" and, when he went to visit his daughter and granddaughter, around July 1, 2002, he was too exhausted to enjoy picking up his granddaughter and carrying her around. Id. As a result, he quit his real estate position a few days later. Id.

The Plaintiff testified that he suffered from a condition called "atrial phobia," which he defined as a fear of medical treatment and, for forty (40) years, he practically never visited a doctor, until five (5) years prior to the Hearing, when he began to have problems with his heart. [T. 224-25]. He explained that he was seeing a woman, who worked in a nursing home, and who told him that he had the beginnings of congestive heart failure. [T. 225-26]. When asked to explain his symptoms, the Plaintiff testified that he had shortness of breath, difficulty with concentration, and frequent urination. [T. 226-28]. The Plaintiff further stated that he did not have any pain associated with his condition, but rather, an awareness that something was wrong. [T. 228].

The Plaintiff testified that, around 1999, his heartbeat was irregular, which caused him to go on the computer, and compare his heart rate with those associated with different medical conditions and, as a result, he "diagnosed [him]self with afib." [T. 228]. After reading more about it, he determined that his "biggest risk factor was

- 12 -

to have a stroke" and, when he submitted a question, online, about his risk factor, he received a response from a doctor, in which he was informed that his risk factor was twice that of the general population. [T. 229]. Nevertheless, the Plaintiff refused to seek medical treatment, but he did read up on the treatment for atrial fib, which he stated was to control his heart rate, in an effort to try and prevent a stroke, and to take aspirin. Id. The Plaintiff testified that Coumadin was probably more common, but he thought that aspirin would be sufficient, because it was "the drug of choice," in Australia, for his condition. Id. The Plaintiff further stated that, through his research, he learned that there were some powerful drugs, which caused side effects, and radiofrequency ablation, which he was not ready to do. [T. 230]. Even though he acknowledged that it interfered with his job, and his entire life, the Plaintiff made the decision to continue living the way he was. [T. 230-31].

In his job at the insurance agency, the Plaintiff had days where he was "wiped out," and he stated that he constantly played "catch-up." [T. 231]. The Plaintiff described his work situation as "wonderful," and he stated that he felt that, if there was any way to continue working for another three to four years, in order to be in a better position for retirement, he would do so, but he could not. [T. 232]. Although he stated that there was no retirement, "as such," from his insurance position, he had a

contract with Farmers Insurance Group ("Farmers"), which made payments to him.
Id.

In August of 2001, the Plaintiff suffered from a headache, which did not abate over the course of ten (10) days, and so he decided to go to the doctor, who told him that his headache was from stress, and who confirmed his self-diagnosis of "afib."  [T. 232-33].  The same day, the Plaintiff made another appointment, with a different doctor, and he decided that he could not continue to work, but he waited until the end of October of 2001, to give his notice, which was contractually required to be ninety (90) days.  [T. 233].  Thus, January 31, 2002, was the Plaintiff's last day of work.  [T. 234].  When he first went to see the doctor, the Plaintiff was told that he needed a complete physical, blood was drawn, and he was prescribed Atenolol, which is a beta blocker.  Id.  Before the date of his second appointment, the Plaintiff received notice from his insurance company, that they would not pay that doctor, because he was not on their list.  Id.  The Plaintiff returned to him anyway, and his doctor helped him to select a new, approved doctor -- namely, Dr. Long.  Id.

The Plaintiff testified that he began the course of Atenolol, but it did not make a difference with his symptoms, and Dr. Long later added Diltiazem.  [T. 234-35].  While that prescription did not affect his afib, either, the Plaintiff stated that it may have

- 14 -

been helping him in ways that were not manifested.  [T. 235].  The Plaintiff stated that the doctors had not recommended other treatments, such as the oblation, or a pacemaker, but the Plaintiff was subsequently referred to a cardiologist -- namely, Dr. Taylor.  [T. 235-36].  Dr. Taylor recommended the radiofrequency ablation, but the Plaintiff had not "convinced [him]self to do it" and, since he had changed insurance companies to Minnesota Comprehensive Care, the Plaintiff may have a "pre-existing condition exclusion."  [T. 236].  When asked whether his decision was based more on the coverage issue, than his health concerns, the Plaintiff testified only that, at that time, he had better coverage than he did at the time of the Hearing, but that he could not convince himself to do it.  [T. 236-37].

With regard to his stress headaches, the Plaintiff testified that leaving his job had eliminated a lot of his stress.  [T. 237].  However, his episodes of atrial fib did not change when he stopped working, and he currently experienced it on a chronic basis. [T. 238].  When asked whether that change to a chronic condition had made him reconsider his treatment options, the Plaintiff responded that "the day will probably come when I try an oblation."  Id.

The ALJ noted that, in August of 2001, the Plaintiff had reportedly gone on an eighteen (18) mile bike ride.  The Plaintiff stated that he had gone on one bike ride, in

the Summer of 2003, which also happened to be eighteen (18) miles long, and that he rides a hybrid bike, which is a cross between a mountain bike, and a road bike. [T. 238-39]. The Plaintiff stated that he continued to ride his bike for health reasons, and that he no longer had the same exhilaration as he once did. [T. 239]. The only other exercise he did, on a regular basis, was at work, where he spent four (4) hours on his feet walking around, and where he had to carry boxes, that ranged from five (5) to fifty (50) pounds. [T. 239-40]. Afterward, he often took a long nap. [T. 240].

The Plaintiff testified that he did not smoke, but that he did not sleep very well at night, although he stated that he had not ever been diagnosed with an anxiety disorder. [T. 240]. Other than visiting his daughter, and granddaughter, a couple of times per year, the Plaintiff did not travel. [T. 241]. In addition to his atrial fib, the Plaintiff had also been diagnosed with a lumbar strain, which had not occurred at work but, while at work, he injured his right elbow, which continued to be a little sore, and for which he was attending physical therapy. Id. The Plaintiff testified that he usually consumed two or three Advil during the course of a four (4) hour shift and, even though his therapist had demonstrated some exercises for his back, he did not perform any of them, which he attributed to the fact that he had not yet purchased the necessary

exercise ball.  [T. 242].  However, the Plaintiff acknowledged that there were exercises that he could perform, without the aid of the ball.  Id.

Then, the Plaintiff's attorney questioned him about his difficulty in concentrating.  [T. 243].  The Plaintiff testified that, when he experienced afib a couple of times per week, he was unable to complete any work, because he did not feel right, and he did not have the ability to sit, and focus, when "so many other things were happening to [him]."  [T. 243-44].  Instead, he focused on the way he felt.  [T. 244]. The Plaintiff stated that he was only able to focus long enough to take a note, when somebody called, but then he would have to wait until he felt better to take care of it, and he would have to work "like crazy," in order to get caught up again.  Id.  The Plaintiff attributed his stress headaches to the pattern of work, because there were no other stressors present in his life at that time, and he stated that his job was not very tolerant of mistakes.  [T. 244-45].  Additionally, the Plaintiff testified that he suffered from fatigue, to some degree, as a result of the interference with his sleep patterns.  [T. 245].

The Plaintiff testified that he would not be able to work for someone else, and that he would not have quit working at his own agency, where he earned approximately $60,000.00 per year, if not for his condition.  [T. 245-46].  He reiterated that his goal

was to work until he was sixty-two (62), or sixty-three (63) years old, before retiring. [T. 246].

In his real estate position, the Plaintiff experienced the same pattern of afib a couple of times a week, which affected his work, because he "should feel good every day and be able to keep pursuing [his] occupation." [T. 247]. However, he was only required to be there for four (4) hours every Tuesday and Friday and, for the rest of the time, he would be anywhere that he wanted. Id. The Plaintiff related that, on one occasion, he was walking up to look at a house, which required him to ascend a flight of stairs, and he was breathing so hard, that he walked to the side, in order to catch his breath, without anyone noticing. [T. 247-48]. The Plaintiff compared it to riding his bike, which he still did, in order to maintain the adequate blood supply to his heart, but which was no longer the same enjoyable experience that it had been. [T. 248].

When asked whether he still had trouble focusing, the Plaintiff testified that he could focus at Menards, because the work was almost totally mindless, but that, while reading the newspaper, he had trouble "boring in and concentrating on anything." [T. 248]. The Plaintiff also stated, in response to being asked whether he could perform his job as an insurance agent, "I wouldn't attempt to do it." [T. 248-49]. With regard to work that required him to make decisions, and judgments, the Plaintiff stated that

- 18 -

he did not know whether he could do it, and that it would depend on how he felt, but that he probably could not sustain such work on a full-time basis.  [T. 249].  Nor did he think that he would be able to work at Menards full-time.  Id.

Furthermore, the Plaintiff related that, at his insurance office, his stress was somewhat variable, but mostly in the four to five range, on a five point scale, with five being the highest level of stress, because he was constantly making decisions, and everything was reliant on what he could do.  [T. 249-50].  In response to a question from the ALJ, the Plaintiff testified that the stress was due to his physical condition but, when his attorney resumed questioning, the Plaintiff stated that, if his position as an insurance agent was at a level five on the stress scale, he could not perform that work.  [T. 250].  The Plaintiff rated his position, at Menards, as a level one on the stress scale, and he stated that it was "exactly where [he] want[ed] to be," and that he would not want to attempt more than that.  [T. 251].  The Plaintiff explained that his insurance position was stressful, because of the cycle of falling behind, due to his condition, and then having to catch up with his work.  [T. 251-53].

The ALJ renewed his questioning, and the Plaintiff stated that he did all of the chores around the house, but he was governed by the way he felt.  [T. 253].  Although

he ran behind on those chores, as well, it did not make any difference, because he was the only one present.  [T. 253-54].

The Hearing continued with the testimony of the Medical Expert ("ME"), who confirmed that she had never treated the Plaintiff as a patient, but that she had reviewed all of the available medical evidence.  [T. 254].  The ME was allowed to question the Plaintiff, and she asked him whether his feeling that he was always in atrial fib was based on his own feelings, or whether it had been confirmed by a doctor.  [T. 254-55]. The Plaintiff replied that he could "tell" when he was in afib, by how he felt, and by taking his pulse, and that he could walk into the doctor ay any time, and obtain confirmation.  [T. 255].  The ME then listed the Plaintiff's impairments, as including recurrent atrial fibrillation, hypertension, intermittent back pain, and dry eye, which did not meet or equal the Listings,[7] either individually, or in combination.  Id.  The ME explained that, under the Listing for recurrent arrhythmias, the Plaintiff had not had any syncopal episodes, which were required, and that the other impairments did not appear to be significant.  [T. 255-56].  Based on those impairments, the ME would impose the

---

[7]Appendix 1 contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

- 20 -

following limitations: "occasional, 50 pound[s], 20 [pounds] on a more frequent basis, stand/walk six out of eight [hours], sit six out of eight [hours]," and "[w]ith the cardiac diagnosis, I would avoid the hazardous climbing stairs, scaffolding, that type of thing." [T. 256].

The Plaintiff's attorney noted that the ME's limitations were higher than those of the State Agency physicians, who had placed him more at the twenty (20) pound limit. [T. 256]. The ME explained that "they did that basically because of the possibility that the best case scenario would be light, and if you take into consideration the claimant's symptoms, that may be a reasonable -- that was not their limitation, there was not on the basis -- that was based on the possibility." Id. The ME acknowledged that it might be a reasonable limitation, and that it was possible to have fatigue associated with the condition. [T. 256-57]. When the Plaintiff's attorney inquired about the various other problems that the Plaintiff had mentioned -- namely, difficulty focusing, and stress -- the ME stated that the charts did not comment on those problems, although, when the report, which is found at Exhibit 7-F,[8] was pointed out

_____

[8]There was initially some confusion as to whether the ME had a copy of Exhibit 7-F but, after a brief discussion off-the-record, it was discovered that the ME did have that document, and had reviewed it. [T. 258].

to her, she testified that it contained the patient's statements, and that it simply noted

stress, without further elaboration.  [T. 257-58].

The Hearing continued with the testimony of the Vocational Expert ("VE"), who

had reviewed the vocational evidence in the Plaintiff's file, and who was familiar with

jobs in the State of Minnesota.  The VE inquired, of the Plaintiff, whether he had

people working for him when he operated the insurance agency, to which the Plaintiff

responded that he had, in the past but, since 1995, it had been just himself, and he did

everything.  [T. 259-260].  The Plaintiff also related that the majority of his contacts

were in the office, and not in the field, and that the most he had to lift was one to two

pounds.  [T. 260].  Although he suggested that there were times that he had to lift as

much as ten to twenty pounds, he did not associate that with the requirements of the

job, but rather that it would involve such tasks as moving a typewriter.  [T. 261].  The

Plaintiff spent most of his time in the office, and his contacts were over the phone, and

face-to-face meetings with people.  Id.  When asked whether he could have cut down

his hours, rather than quitting the job, the Plaintiff testified that he had a contract with

Farmers, which required him to conduct his office in accordance with standard

business practice, and that he had so many people come in on a daily basis, that he

could not do so.  Id.  The Plaintiff also stated that Farmers was the primary carrier with

which he contracted, but that there was no quota system, or a minimum number of sales that he had to make.  [T. 262].

The VE then testified that he would strike the position as a real estate agent, from his report, because it was not substantial gainful activity.  [T. 262-63].  Further, the Plaintiff's then current position, as a retail stock clerk, would be classified as a heavy, semi-skilled position, although the Plaintiff was performing it somewhere in the light to medium range of exertional demands, because he mainly dealt with lighter objects, and only occasionally lifted up to fifty (50) pounds.  [T. 263].  Finally, the VE corrected his report to categorize the Plaintiff's position, as an insurance agent, as a sedentary, rather than a light position, given the manner in which the Plaintiff performed the job, and the VE chose not to add any transferable skills to his report.  Id.

The ALJ then posed a hypothetical to the VE, which asked him to assume a male, from fifty-nine (59) to sixty-one (61) years of age, with approximately sixteen (16) years of education, and with the past work experience, as set forth in the VE's report.  [T. 264].  The ALJ related that the individual was impaired primarily by recurrent atrial fibrillation, and that he also had hypertension, intermittent back pain, and dry eye, as well as some headaches, that were noted in August of 2001.  Id.  The ALJ limited the individual to a medium exertional level -- namely, lifting fifty (50) pounds

- 23 -

occasionally, and twenty (20) pounds frequently, sitting or standing up to six (6) hours of each day, with an avoidance of "hazardous climbing stairs and scaffolding, things of that nature." Id. With those limitations in mind, the VE testified that the individual would be able to perform the past job of a sales agent. Id. When asked about the stock clerk, the VE noted that it appeared as though the Plaintiff was not performing that at a level compatible with substantial gainful activity. [T. 264-65].

Even if the individual were limited to a light exertional level, the VE testified that it would not change his assessment, with regard to the individual's ability to perform the past work. [T. 265]. The ALJ also inquired into the transferability of any skills, to which the VE testified that "there are various sales representative types of positions, roughly looks like 30, 40 different types of sales representative, types of occupations * * * that would have similar characteristics." [T. 265-66]. The VE clarified that, although the tools, the word processes, and the telephone would be similar, the industry would be different, such that the person would have to learn more about the products being sold. [T. 266]. The VE also stated that the closest position would be in financial services, and even that would still require more than sixty (60) to ninety (90) days to learn the products. [T. 266-67].

Going back to the original hypothetical, the ALJ imposed the additional requirement of being limited to only moderate stress, and the VE stated that the past work would still be possible, and that he would not characterize that position as high stress, particularly where the person was the owner of the business, and had the flexibility to make adjustments as necessary. [T. 267]. The Plaintiff's attorney asked the VE to consider a position where the stress came from not only the immediate work, but the work that "flow[ed] from that," such as "taking care of the client's problem, taking care of the paperwork that has to be done, [and] doing the things that phone call triggers." [T. 267-68]. The VE responded that it was the same type of situation that one would find with most professional positions, and it would still be classified under the moderate stress range. [T. 268]. However, if the person could not tolerate that kind of stress, he would not be able to work in the insurance sales business. [T. 268-69]. After some closing remarks by the Plaintiff's attorney, the Hearing concluded.

C.     The ALJ's Decision.   The ALJ issued his decision on December 13, 2003. [T. 13-23]. As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §404.1520.[9] As a threshold matter,

---

[9]Under the five-step sequential process, the ALJ analyzes the evidence as
(continued...)

- 25 -

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity, since his alleged onset date.  [T. 17-18].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise his ability to engage in work activity.  After considering the Plaintiff's medical history and the testimony given at the Hearings, the ALJ found that the Plaintiff was severely impaired by atrial

---

[9](...continued)
follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

fibrillation and a lumbar strain.  [T. 19].  The ALJ also found that the Plaintiff had non-severe impairments of right elbow pain, and intermittent low back pain.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P of the Regulations.  See, 20 C.F.R. §404.1520(d).  The ALJ determined that the Plaintiff's impairments did not meet, or equal, the criteria of any Listed Impairment.  [T. 19].

The ALJ then determined the Plaintiff's residual functional capacity ("RFC").[10] [T. 19-21].  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  The ALJ concluded that the Plaintiff was not entirely credible, and that his testimony, and allegations of total disability, were not supported by the objective medical evidence of record, his daily activities, and his appearance, and demeanor at the Hearing.  [T. 21].  In particular, the ALJ noted that the Plaintiff's only symptoms were shortness of breath, a lack of energy, and a

---

[10]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that affect that individual's ability to perform work-related tasks.  20 C.F.R. §§404.1545.

tendency to become tired easily, but the Plaintiff was nevertheless able to work twenty

(20) hours per week, and take long bicycle rides.  Id.  After considering the testimony

at the Hearing, the opinions of the Plaintiff's treating physician, the objective medical

evidence, and the Plaintiff's subjective complaints, the ALJ determined the Plaintiff's

RFC to be as follows:

> [N]o period of 12 consecutive months elapsed during which
> the claimant lacked the residual functional capacity to
> perform a reduced range of medium work as defined in 20
> CFR § 404.1567 that involves lifting and/or carrying of
> objects weighing up to fifty pounds occasionally and up to
> twenty pounds frequently, and that involves siting [sic]
> standing and/or walking for up to six hours total in an eight-
> hour workday and that requires no exposure to hazards and
> no climbing of stairs, ladders, ropes or scaffolds.

[T. 21].

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff could perform his

past relevant work, as an insurance sales agent, as he had performed that job.  [T. 21-

22].  The ALJ concluded that the Plaintiff was not disabled, and was not under a

"disability," as defined in the Social Security Act, and therefore, it was unnecessary for

him to proceed to the final step.  [T. 22-23].

IV.  <u>Discussion</u>

- 28 -

A.   <u>Standard of Review</u>.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, <u>Title 42 U.S.C. §405(g)</u>; see also, <u>Moore ex rel. Moore v. Barnhart</u>, 413 F.3d 718, 721 (8th Cir. 2005); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002); <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994), citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>ex Rel Moore</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

Where, as here, new evidence has been submitted to the Appeals Council, which the Council has examined in declining to review the ALJ's determination, our task is not fundamentally different, although the Record we review is expanded to incorporate the new evidence.  On such occasions, the Appeals Council is to treat the new evidence as though it were a part of the Record before the ALJ, and "then review the case if it finds that the administrative law judge's action, findings, or conclusion [were] contrary

to the weight of the evidence," which now includes the new evidence.  Brosnahan v. Barnhart, 336 F.3d 671, 675-76 (8th Cir 2003), citing Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).  Should the Appeals Council decline to review the case further, the reviewing Court's role is to "review the ALJ's decision and determine whether there [was] substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."  Id., quoting Browning v. Sullivan, 958 F.2d 817, 823 n.4 (8th Cir. 1992); see also, Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994)(noting that the standard creates "a peculiar task for a reviewing court," because it asks the Court to decide how the ALJ would have decided the matter had this additional evidence been before him or her).  See, Cunningham v. Apfel, supra at 500.

    B.    Legal Analysis.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

    1.    The ALJ's Credibility Determination was not Supported by Substantial Evidence on the Record as a Whole.

    2.    The ALJ's Assessment of Functional Limitations in the Hypothetical to the Vocational Expert was Unsupported by Substantial Evidence.

We address each contention in turn.

- 32 -

1.     Whether the ALJ's Credibility Finding was Supported by Substantial Evidence on the Record as a Whole.

a.     Standard of Review.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  See, Driggins v. Bowen, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).  Accordingly, if adequately explained, and supported, credibility findings are for the ALJ to make.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, Eichelberger v. Barnhart, supra at 590, citing Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).  These requirements are not mere suggestions, but are mandates

that impose affirmative duties upon the ALJ.   Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823 (8th Cir. 1996).   Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.    the claimant's daily activities;

2.    the duration, frequency, and intensity of the pain;

3.    precipitating and aggravating factors;

4.    dosage, effectiveness and side effects of medication; and

5.    functional restrictions.

Polaski v. Heckler, supra at 1321-22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole.  Cf.,

- 34 -

Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).  "However, the ALJ need not explicitly discuss each Polaski factor," as "[t]he ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain or other subjective symptoms solely because there is no objective medical evidence to support them.  Ostronski v. Chater, supra at 418;  Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain).  However, the claimant's complaints may be discounted based upon inconsistencies in the record as a whole."  Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005), citing Lowe v. Apfel, supra at 972.

It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical

condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997).

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487. Among the daily activities, which

counterindicate disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

       b.   Legal Analysis. The Plaintiff argues that the ALJ's credibility determination was unsupported by substantial evidence on the Record as a whole. In support of this argument, the Plaintiff asserts the medical record supports his testimony, and that the ALJ failed to properly weigh the Plaintiff's work record in assessing his credibility.

   In  determining the Plaintiff's RFC, the ALJ was obligated to consider all of the Plaintiff's symptoms, including his subjective complaints of physical limitation under the standard enunciated in Polaski v. Heckler, supra at 1322. An ALJ may properly discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. See, Johnson v. Chater, 108 F.3d 942, 947. Here, the ALJ agreed with the Plaintiff that he exhibited symptoms from atrial fibrillation, but the ALJ also found that the effects of the condition were insufficient to render the Plaintiff

- 37 -

totally disabled, notwithstanding the Plaintiff's subjective assessments of his physical limitations. [T. 22].   The evidence the ALJ relied upon to reach that conclusion included the medical opinions, and conclusions, of the Plaintiff's cardiologist, and other medical experts, the Plaintiff's daily activities, and his appearance and demeanor at the meeting. [T. 21].

The Plaintiff's cardiologist found that Plaintiff functioned "quite well" despite his condition.   [T. 184].   The additional medical experts all agreed that the Plaintiff was able to perform work at the light to medium exertional level.  [T. 116-23, 148-56, 254-58].   Indeed, the Plaintiff cites to no medical evidence that any of his treating physicians regarded him as disabled from working in general, or as an insurance agent in particular. Rather, in consulting with his cardiologist, Dr. Taylor, in August of 2003, the Plaintiff self-reported that "[h]e is quite active," "[h]e bikes up to 60-70 miles at a time," and "he tolerates this without any angina or excessive dyspnea except when he is in atrial fibrillation when he does experience fatigue and dyspnea."  [T. 130].   Although the Plaintiff chides the ALJ for citing his testimony during the Hearing, that he rode his bike, in 2003, for eighteen (18) miles, as being related to but "one occasion," such a characterization is highly myopic, given the fact that the ALJ had first called the Plaintiff's attention to a report, in the Record, that the Plaintiff had ridden his bike, in

August of 2001, for eighteen miles. [T. 130]. On this Record, with bike rides of eighteen miles in 2001, [T. 175], and 2003, and bicycling for up to 60-70 miles at a time, in 2002, is hardly consistent with an individual who is wholly disabled. The Plaintiff offers no basis to discredit the medical evidence of Record.

In the Plaintiff's daily life, he was able to maintain a job stocking hardware, and keep up with people in their 20s, remain physically active, and engage in long bike treks. [T. 130, 183, 185]. In October of 2002, the Plaintiff reported that, although he was not currently working, he remained "busy with projects such as remodeling his house." [T. 126]. Moreover, in addition to working twenty (20) hours a week at Menards, the Plaintiff also does "all the things around [his] house," as he does not have anyone coming in to help. [T. 253]. Indeed, there is no showing, on this Record, that the Plaintiff is more incapacitated, in terms of his physical capabilities, than is reflected in the ALJ's RFC. Given this Record, the ALJ concluded that the Plaintiff was less than fully credible, and that his testimony, and allegations of total disability, were not substantially supported by the Record as a whole. [T. 21].

We are mindful of the Plaintiff's complaint, that the ALJ failed to specifically address his previous work record in the credibility analysis that is required under Polaski v. Heckler, supra at 1322. Without doubt, the Plaintiff's work record must be

- 39 -

considered in the evaluation of the Plaintiff's subjective symptoms, however, contrary to the Plaintiff's suggestion, "that a worker who has good earnings is entitled to substantial credibility," quoting Shepard v. Callahan, 969 F. Supp. 526, 531 (S.D. Iowa 1997), we do not find the suggestion to be a fully accurate statement of the law of this Circuit. As our Court of Appeals observed, in Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2002), citing Singh v. Apfel, 217 F.3d 586, 591 (8th Cir. 2000), vacated, but adopted in pertinent part, 222 F.3d 840, 853 (8th Cir. 2000):

> A consistent work record may support the credibility of a claimant's subjective complaints.

Moreover, as we have previously noted, an ALJ is not required to explicitly discuss each factor if it has been acknowledged and considered before discounting a subjective complaint. See, Strongson v. Barnhart, supra at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Here, the ALJ did note the previous work record of the Plaintiff as an insurance sales agent, as well as the fact that he had also owned his own insurance agency, which essentially employed only himself. [T. 20-21]. Furthermore, given the Plaintiff's predominant reliance upon such a basis for presuming credibility, the ALJ explored the Plaintiff's past work history during the course of the inquiry at the Hearing. [T. 218-19, 232]. While we would have much preferred a specific

- 40 -

assessment, by the ALJ, of the Plaintiff's past work history, in view of the Record as a whole, we do not find that failure of detail to warrant a reversal and remand.        W understand the Plaintiff to argue that his continued involvement as an insurance underwriter was highly stressful, due to his periodic bouts of atrial fibrillation, which caused sporadic periods when he would have to work aggressively to complete the work he deferred when the bouts affected him.  We also understand, by the Plaintiff's own admission, that he intended to retire at the age of 62 or 63, although he was receiving some form of stipend, from one of the insurers he was marketing, after he elected to leave the underwriting business.   [T. 232]. The simple fact, however, is that the Record is bereft of any complaints by any insurer the Plaintiff marketed as to his productivity or judgment, any evidence of any major, and costly, mistake on the Plaintiff's part, owing to his atrial fibrillation, or any medical opinion that the Plaintiff seek other employment.   Rather, the Record demonstrates that, before the Plaintiff elected to leave the insurance business, he had his most profitable year, exceeding his compensation in the previous year by some twenty-seven (27) percent.[11]

---

[11]In the years from 1997 to 2000, the Plaintiff was reporting income of approximately $50,000.00 annually -- with the highest income reported in 1998, at $53,442.00.  In 2001, however, the Plaintiff reported an annual income of $64,233.00,
(continued...)

We accept that there could be any number of reasons for the significant increase in the Plaintiff's yearly income, for the year that just preceded his alleged onset date of disability, but he offers none in this Record.  See Eichelberger v. Barnhart, supra at 591 ("The burden is on the claimant to demonstrate that he or she is unable to do past relevant work," and "[o]nly when the claimant establishes the inability to do past relevant work does the burden shift to the Commissioner."), citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  We also accept that, for personal reasons, some individuals may choose to ease their way into retirement, or may seek new vocational, or avocational goals, following a long and successful business venture, or they may be compelled by poor health, or disability, to find less challenging employment.  Given the Record in its entirety, here, we cannot say that the ALJ's finding, that the Plaintiff was not disabled, but could return to his previous employment, was error.  In sum, we find that the ALJ complied with the requisites of Polaski, and adequately considered the Plaintiff's past work history in the credibility analysis.

---

[11](...continued)

notwithstanding the stress of his position, and his bouts of atrial fibrillation. [T. 57-58; T. 66].

Accordingly, we find that the ALJ properly discredited the Plaintiff's testimony, after thoroughly reviewing the Record as a whole, insofar as the Plaintiff alleged a total disability.  The ALJ provided well-documented reasons for discrediting the Plaintiff's subjective complaints, and those reasons, and the evidence cited, substantially support the ALJ's determination in that regard.  "The ALJ is in the best position to gauge the credibility of testimony and is granted deference," Sarna v. Barnhart, 32 Fed.Appx. 788, 791 (8th Cir. 2002), and "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record." Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); see also, Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [the claimant's] credibility is primarily a matter for the ALJ to decide."), citing Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001)("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."), citing in turn, Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  Since we find no basis to reverse the Plaintiff's credibility rulings, we reject that challenge to the ALJ's determination.

2.    <u>Whether the ALJ's Assessment of Functional Limitations in the Hypothetical to the Vocational Expert was Unsupported by Substantial Evidence</u>.

a.    <u>Standard of Review</u>.  In determining the Plaintiff's RFC, and in framing an appropriate hypothetical for a VE, the ALJ need only include the limitations he accepted, as being supported by substantial evidence.  See, <u>Vandenboom v. Barnhart</u>, supra at 928-29 ("The hypothetical question need only include those impairments and limitations found credible by the ALJ, see Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004), and the claimant bears the burden to establish that he or she cannot return to past relevant work."), citing <u>Eichelberger v. Barnhart</u>, supra at 591; <u>Pertuis v. Apfel</u>, 152 F.3d 1006, 1007 (8th Cir. 1998); <u>Rappoport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th Cir. 1991).  Those limitations are designed to replicate the Plaintiff's RFC, so as to allow the VE to identify jobs in the economy, if any there be, which an individual with functional limitations, like those of the Plaintiff, would be able to perform.  See, <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1317 (8th Cir. 1991); <u>Cline v. Sullivan</u>, supra at 565.

Moreover, it is well-settled that the testimony of a VE, which is based upon a properly-phrased hypothetical question, constitutes substantial evidence.  See, e.g., <u>Garza v. Barnhart</u>, 397 F.3d 1087, 1090 (8th Cir. 1005), quoting <u>Hutton v. Apfel</u>, 175

F.3rd 651, 656 (8th Cir. 1999); Howard v. Massanari, supra at 582; Warburton v. Apfel,

188 F.3d 1047, 1049 (8th Cir. 1999).  In order to rely upon a VE's opinion, however,

the hypothetical posed "must fully set forth a claimant's impairments."  Sullins v.

Shalala, 25 F.3d 601, 604 (8th Cir. 1994), cert. denied, 513 U.S. 1076 (1995), citing

Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992).

    b. Legal Analysis.   The Plaintiff argues that the ALJ's

hypothetical was flawed because it did not include Plaintiff's inability to function due

to atrial fibrillation, and because the ALJ failed to properly assess the Plaintiff's

credibility.  We have already determined that the ALJ thoroughly reviewed the Record

so as to ascertain that the Plaintiff's symptoms from atrial fibrillation were insufficient

to render the Plaintiff disabled, notwithstanding the Plaintiff's subjective complaints of

severe physical limitations.  We have also found that the ALJ did not err in discrediting

the Plaintiff's subjective complaints of limitation.  Therefore, it was appropriate for the

ALJ to  only include, in his hypothetical to the VE, the limitations he accepted, as

supported by substantial evidence.  See, Pertuis v. Apfel, supra at 1007; Rappoport v.

Sullivan, supra at 1323.

  The hypothetical posed to the VE included the education, work experience,  and

physical and work-related limitations, which were consistent with the Record; namely,

recurrent atrial fibrillation, hypertension, intermittent back pain, and headaches. [T. 264]. The VE testified that the hypothetical individual could perform past relevant work as a sales agent, which would be limited to either light or medium exertion levels, even if under a moderate stress medical limitation. [T. 264-68]. Accordingly, the ALJ's finding, that the Plaintiff was not disabled because he could perform his past relevant work, was supported by substantial evidence in the Record as a whole. See, Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"), quoting Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985); Andres v. Bowen, 870 F.2d 453, 455 (8th Cir. 1989). Nor is there anything, in the materials submitted to the Appeals Council, which would warrant a different result. Therefore, finding no error in this, or in any other aspect of the ALJ's decision that has been drawn to our attention, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.

- 46 -

    2.      That the Defendant's Motion [Docket No. 14] for Summary Judgment be granted.

Dated: August 18, 2005               s/Raymond L. Erickson

                                      Raymond L. Erickson
                                      UNITED STATES MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than September 2, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 2, 2005**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review

the transcript in order to resolve all of the objections made.